THE STATE OF WYOMING, on the relation of the BOARD OF COMMISSIONERS OF LARAMIE COUNTY, WYOMING, GLEN E. HENDERSHOT, DR. C. A. MOORE, CHARLES H. LEISHER, COMMISSIONERS,

*Petitioners,*

vs.

EARL WRIGHT, State Treasurer of Wyoming,

*Respondent,*

CITIES OF CHEYENNE, RAWLINS and CASPER, WYOMING, Municipal Corporations,

*Intervenors.*

(No. 2328; November 6th, 1945; 163 Pac. (2d) 190)

114

For the Petitioners ,the cause was submitted on the brief and also oral argument of Edward Byron Hirst and Allen A. Pearson, both of Cheyenne, Wyoming.

For the Respondent, the cause was submitted on the brief of Honorable Louis J. O'Marr, Attorney General, Hal E. Morris, Deputy Attorney General, and Frank M. Gallivan, Assistant Attorney General ,all of Cheyenne, Wyoming and oral argument by Mr. Morris.

For the Intervenors, the cause was submitted on the brief and also oral argument of Carlton A. Lathrop of Cheyenne, Wyoming, Eph U. Johnson of Rawlins, Wyoming, and E. L. McCrary of Casper, Wyoming.

## OPINION

BLUME, Chief Justice.

This is an original proceeding in mandamus, brought in this court against the State Treasurer by the county of Laramie, to compel the State Treasurer to disburse 25 percent of the revenues derived from the gasoline license tax on the basis provided by Section 115-1108 Revised Statutes of 1931 as amended by Section 7 (1) of Chapter 72 of the Session Laws of 1935. The amended act of 1935 provided that of the revenues mentioned 25 percent should be disbursed to the several counties in the state, on the basis provided by the act; that out of such revenue should be paid the interest on the outstanding highway bonds, and that the remainder (nearly 75 percent) should be paid into the State Highway Fund, for the use of the Highway Department. The cities of Cheyenne, Casper and Rawlins were permitted to intervene herein, and they have filed a brief and argued the case orally along with the main parties in the case. The State claims (in part concurred in by the intervenors), that only 23 percent of such revenue should be distributed among the several counties (including towns with a less population than 1500), and that 2 percent of such revenue should be distributed to the several cities and towns in this state over 1500 population, in accordance with the provisions of Chapter 157 of the Session Laws of 1945, as

corrected. That chapter as printed provides for the distribution to counties, including towns of less than 1500 population, of 25 percent of the revenues above mentioned, and 2 percent to the cities and towns of the state of a population of more than 1500. But the state claims that the term 25 percent is a clerical error and should be corrected by this court to read 23 percent. The petitioner concedes the error, but claims that this invalidates the whole act, and that, accordingly the distribution should be made in accordance with the enactment of 1935 above mentioned.

The facts are not in dispute and will be briefly summarized as follows (leaving out facts which are not involved in the contention herein): On January 19, 1945, there was introduced in the House of Representatives a bill known as House Bill No. 37 to amend subsection 1 of section 7 of chapter 72 Session Laws of 1935. The bill, in brief, provided for the distribution of 23 percent of the revenues above mentioned to counties, and 2 percent thereof to cities and towns of over 1500 population. The bill was amended in the House to provide for a distribution of 25 percent of the foregoing revenues to counties, without disturbing the provision in reference to the distribution to cities and towns, and as thus amended the bill duly passed the house. The Senate refused to agree to the amendment made by the House, restored the 23 percent mentioned in the original bill, and as thus amended the bill duly passed the Senate. When the bill got back to the House, the latter refused to concur in the action of the Senate. Thereupon a conference committee was appointed. That committee recommended several amendments among which were—the only one necessary to be mentioned—that only 23 percent of the foregoing revenue should be disbursed to counties (including towns of less population than 1500), and that 2 percent of such revenue should be paid to cities and towns of over 1500

population, as shown by the original bill. Both the Senate and the House agreed to these amendments, and the bill as thus amended was duly passed by both Houses on February 17, 1945, the last day of the Session of the Legislature.

The bill as thus passed was enrolled, known as Enrolled Act. No. 96, but instead of providing that 23 percent of the foregoing revenue should be distributed to counties, provided for 25 percent thereof. The enrolled bill, containing this error, was duly signed by the presiding officers of both Houses, and was thereupon presented to the Governor of State, who, on February 27th or February 28th, 1945, approved the bill and filed it in the office of the Secretary of State, accompanied by the following letter:

"STATE OF WYOMING
EXECUTIVE DEPARTMENT
CHEYENNE

LESTER C. HUNT                    ZAN LEWIS
    GOVERNOR                        SECRETARY

February 27, 1945

Dear Mr. Secretary:

I am attaching hereto Enrolled Act. No. 96, House of Representatives of the Twenty-eighth Legislature of the State of Wyoming, being Original House Bill No. 37.

This Act as enrolled provides for the apportionment of twenty-five percent of gas license tax revenue among the counties in accordance with the formula set forth in the Act. An examination of the journals of both the Senate and the House discloses that the bill as actually passed provided for an apportionment of twenty-three percent of the gas tax revenue among the counties; so it must be apparent that the Legislature never passed the Enrolled Act, at least insofar as it apportioned twenty-five percent of such revenues.

If the only subject covered by the above Act were the allocation of gas license tax revenues to the counties, I would have no hesitancy in holding the entire Act as enrolled void. However, you will observe that provision is also made for allocation of two percent of such revenue to cities and towns. This part of the Act seems to be in the form actually passed, and since it can be separated from the invalid part of the Enrolled Act, it is my opinion that it would be upheld by the courts even though the first part relating to counties be declared invalid.

Therefore, wishing to assist the cities, a few of which are in need of additional revenue, and, at the same time, believing this matter can be taken to and decided promptly by the Supreme Court, I am approving the Act.

> Yours very truly
>
> (Signed) Lester C. Hunt
> Governor."

I. The intervenors contend that we should adopt the rule that the enrolled bill as signed by the officers of the Legislature and the Governor, is conclusive on the courts, and should not be disturbed.

Some of the courts have adopted that rule. Other courts hold that, in order to determine whether an act has been passed in conformity with constitutional requirements, the journal may be consulted. In 1872, the court of the Wyoming Territory held that "if it should appear from the journals that any act did not receive the requisite majority, or that in respect to it the Legislature did not follow any requirement of the constitution, or that in any other respect the act was not constitutionally adopted, the courts may act upon the evidence and adjudge the statute void." Brown vs. Nash 1 Wyoming 85. Union Pacific R. R. Co. vs. Carr, 1 Wyoming 96 followed that decision. Section 25, article 3 of our constitution provides that "no bill shall become a law except by a vote of a majority of all the

members elected to each house, nor unless on its final passage the vote taken by ayes and noes, and the names of those voting be entered on the journal." Considering that provision, this court held in an exhaustive opinion by Chief Justice Potter in the case of State ex rel. vs. Swan 7 Wyoming 166, 51 Pacific 209, (1897) that the journals may be consulted as to whether or not an act has been constitutionally passed .Many of the authorities were cited, and the opinion stated that the rule laid down in that case was the prevailing rule in this country. The rule was subsequently recognized as the rule of this state in State ex rel. Cahill 12 Wyoming 225, 75 Pac. 433; State ex rel. Gillespie 12 Wyoming 284, 75 Pac. 1135, Younger vs. Hehn, 12 Wyoming 289, 75 Pac. 443; George Bolln Company vs. Irrigation Company, 19 Wyoming 542, 121 Pac. 22; Arbuckle vs. Pflaeging, 20 Wyoming 351, 123 Pac. 998; State vs. Smart, 22 Wyoming 154, 136 Pac. 114, and inferentially in State vs. Hall, 27 Wyoming 227, 194 Pac. 476.

The intervenors herein have argued that the prevailing rule in this country has changed since the decision in State ex rel. vs. Swan, and they earnestly and vigorously contend that the rule making the enrolled act, when properly signed, conclusive, is the better rule, and that we ought to overrule State ex rel. vs. Swan, supra. It will be readily understood that we would and should hesitate to disturb a rule which has been the law in this jurisdiction for 73 years. Still, in deference to the earnest contention of counsel for intervenors, we have spent considerable time in re-examining the rule in order to determine whether or not the rule making the enrolled act conclusive is now the prevailing rule in this country to the extent of inducing us to overrule our prior decisions. We think that counsel for the intervenors are mistaken that there has been a general tendency in the courts to adopt the rule for which they

contend. It is stated in 1 Sutherland, Statutory Construction, page 224, third edition by Horack published in 1943, that "at the present time the tendency seems to be toward the abandonment of the conclusive presumption rule and the adoption of the third rule leaving only a prima facie presumption of validity which may be attacked by any authoritative source of information." In the case of In Re Hague 104 N. J. Eq. 31, 114 Atl. 546 (1929), the court in considering the adoption of a joint resolution refused to follow the case of Panghorn vs. Young, 32 N. J. L. 29, which adopted the conclusive presumption rule, saying in part (page 66, 104 N. J. Eq.) : "In considering whether the rule of Pangborn vs. Young should be extended to joint resolutions the court must be mindful of the fact that the aforesaid rule is not the rule of at least twenty-eight of the states, and that where such rule has been followed it has been followed reluctantly and only upon the ground of necessity." In note to 21 Iowa Law Review page 575, in discussing the subject before us, it is said that "no case has been found in which the court, having once adopted this journal entry rule as to mandatory constitutional provisions, has ever reversed itself." In 59 C. J. 624, are cited cases from 12, possibly 13 states supporting the rule which makes the enrolled act conclusive. To these states should be added Texas. Jackson vs. Walker, 121 Tex. 303, 49 S. W. 2d, 693. But from them should seemingly be subtracted, as shown by the cases hereafter cited, the states of Arizona and South Dakota and probably Iowa. In 59 C. J. 625-26 are shown the states which reject the conclusive presumption rule, and hold that the journals may be consulted to determine whether or not a legislative act has been passed constitutionally, although the cases differ in certain respects, the nature of which need not be mentioned here. Cases from 21 jurisdictions (inclusive of Louisiana) are cited. To these should be

added, it seems, South Dakota, Oregon, Arizona, Utah, Illinois, West Virginia, and probably Iowa, and perhaps New Jersey—8 states—making 29 states altogether. Barnsdall Refining Company vs. Welsh, 64 S. D. 647, 269 N. W. 853; Boyd vs. Olcott, 102 Ore. 327, 202 Pac. 431; Cox vs. Drug Company, 42 Arizona 1, 21 Pac. 2d 914; Ritchie vs. Richards, 14 Utah 345, 47 Pac. 670 (misconstrued in 4 Wigmore Evidence 3rd ed. page 604); Neiberger vs. McCollough, 253 Ill. 312, 97 N. E. 660, and other Illinois cases; Charleston National Bank vs. Fox, 119 W. Va. 438, 194 S. E. 4; Smith vs. Thompson, 219 Iowa 888, 258 N. W. 190; In re Hague, supra. In view of this situation, it would seem that we would not be justified at this time in abandoning a rule which has been in existence in this jurisdiction nearly three quarters of a century. In the face of the decisions, it is not improbable, should we adopt the rule contended for by the intervenors, it would not be long until other counsel would in the same earnest and vigorous spirit, now manifested by counsel for intervenors, argue and contend that we should return to the rule of Brown vs. Nash and State ex rel, vs. Swan.

II. As above shown, the Legislature intended to give to counties 23 percent of the revenue from the tax on gasoline sales, and 2 percent of such revenue to cities and towns over 1500 population, but that some one by mistake, either inadvertently or intentionally, changed the term "twenty-three" to read "twenty-five" in the enrolled act. Has this court the power to correct the error? It is insisted by the State, and by the intervenors that it has. But their claim as to the power of this court in correction of errors in legislation is so broad and sweeping that we have deemed it necessary or at least advisable to take a brief survey of the authorities on that question, so that, in the light of that survey, the ruling of this court in this case may not be misunderstood. We think that the rule is somewhat

more limited than claimed by counsel. It would seem that, generally speaking, the courts have no right to correct errors made in an enrolled bill, and that the courts will ordinarily take the latter as they find it, and if not constitutionally enacted, will declare it void. But there are exceptions. It is stated in 50 Am. Jur. page 219-220 as follows:

"Courts will not, as a general rule, undertake a correction of legislative mistakes in statutes. This principle is adhered to notwithstanding the fact that the court may be convinced by extraneous circumstances that the legislature intended to enact something very different from that which it did enact. The question is not what the general assembly intended to enact, but what is the meaning of that which it did enact. There are, however, many cases in which it has been regarded as proper to correct legislative errors. In this respect, there is authority for the rule that clerical mistakes should be disregarded, that manifest or obvious mistakes may be corrected, and that erroneous descriptions may be made to describe the thing or object actually intended by the statute. If a clerical error renders a statute incapable of reasonable construction, the proper word or numeral will be deemed substituted, where it can be supplied by reference to the context or other statutes. This is but making the strict letter of the statute yield to the obvious intent * * *".
In 59 C. J. 588, section 123, it is stated:

"The enrolling clerk or committee has no power or authority to modify a bill passed by the legislature in any respect. In those jurisdictions where the enrolled act is not regarded as conclusive as to the existence and contents of the bill, it is generally held that the enrolled bill as presented to, and approved by, the governor must be the same as that passed by the legislature, at least in substance and in legal effect; and where, through some mistake in the enrollment of the bill, a material change has been made, or an altogether different bill is presented to, and signed by, the governor, it does not become a law. However, absolute correspond-

ence between the bill as enacted and as signed by the governor is not necessary, and mere clerical errors and minor discrepancies ,or the hishonesty of an enrolling clerk, will not be permitted to defeat the intent of the legislature."

In Haney vs. State, 34 Ark. 263, the court stated:

"It is very true, as a general rule of construction, that where the language of an act is plain and unambiguous, the courts must give it effect, as it stands, or declare the law unconstitutional. But this rule is subject to much qualification, and does not apply to cases of plain clerical errors, where it is obvious that the legislature did not intend to use the word as written, and it is further apparent what word they did intend. A mistake of this nature may be corrected by the courts, upon as sound principle as a mistake in a deed. It is not judicial legislation, nor judicial interference with the legislative will. It is in support of the legislative will, and wholly distinct from the reprehensible practice of warping legislation, to suit the views of the courts as to correct policy. The only conditions to be observed in the exercise of this power of literal correction are, that the courts should be thoroughly and honestly satisfied of the legislative intent, irrespective of the policy of the act."

From these authorities it appears quite clearly that the courts have the right to correct a clerical error in a legislative act in the proper case. But the serious question before us is as to whether or not we have the proper case before us. In some cases, as for instance Stein vs. Leper, 78 Ala. 517, the courts have taken refuge in the rule that part of the statute may be upheld and part of it declared unconstitutional. We do not think that we can resort to that rule in this case. It may be that the enrolled act in question may, on its face, be said to be severable. But extrinsic facts prevent the application of the rule. If we were to let the last part of the act stand as written, but declare unconstitutional the first part granting part of the revenue

from gasoline sales to counties, the counties in that case would, under the old law, receive 25 percent of that revenue, the cities and towns under the new law 2 percent thereof, and that would leave to the highway department only 73 percent, while under the old law it received 75 percent. It is quite clear from the journals of the legislature that it was the specific intention of the legislature to leave to the highway department the revenue which it had previously received, and hence, we would violate its specific intention by upholding the law as to cities and towns, but striking it down as to counties. It is quite clear in view of the manifest intention of the legislature that either the counties must receive 25 percent of the revenue mentioned, and the cities and towns nothing, or that the cities and towns receive 2 percent and the counties only 23 percent, as shown by the bill actually passed by the legislature.

Nearly all the cases holding that errors and mistakes may be corrected deal with errors and mistakes apparent on the face of the legislative enactment, either standing by itself or in connection with other well known facts. Very few of such cases deal with the question as to whether or not the procedural steps in enacting the law have been followed; that is to say whether or not the act signed by the governor was the act passed by the legislature. In other words, such cases deal in the main with the construction of the legislative enactment, rather than the validity of the steps in its enactment. At times errors may be corrected without referring to any other source. To that class of errors belongs the error mentioned in Bench Canal Co. vs. Sullivan, 39 Wyoming 345, 271 Pac. 221, and see the cases cited in 50 Am. Jur. page 219. To illustrate, it is said in 25 R. C. L. page 978, section 227 that "legislative enactments are not more than any other writings to be defeated on account of mistakes,

errors or ommissions, provided the intention of the legislature can be collected from the whole statute." In the case of State vs. Ry. Co., 38 Minn. 281, 37 N. W. 782, nearly the same language is used. And see State ex rel. vs. Board of Commissioners, 87 Minn. 325, 92 N. W. 216. In other cases appeared an error in the title, chapter, section number or date of a statute sought to be amended, or an error of a similar nature. A more correct and detailed statement of the rule appears in 50 Am. Jur. 220, and the numerous cases cited in the Annotations in 5 A. L. R. 996-1013 and 14 A. L. R. 274. To that class of cases belongs the case of Hollibaugh vs. Hehn, 13 Wyo. 269, 70 Pac. 1044 as well as the case of State vs. Sizemore, 199 N. C. 687, 155 S. E. 724, cited by counsel for the intervenors, where the court stated: "This situation (as to the error) raises a question as to the effect of an error which is apparent upon the face of a statute and the nature of which is ascertainable from the statute itself." In the case of Haney vs. State, 34 Ark. 263, the court corrected the term "fifth Monday" to "fourth Monday". The court insisted that "this clerical error is sufficiently manifest from the general tenor of the act", but apparently was willing, if necessary, to refer to the bill as originally introduced in the legislature. In the case of Rice vs. Road Improvement District, 142 Ark. 454, 221 S. W. 179, cited to us by the State and the intervenors, the court corrected a bill signed by the officers of the legislature and the governor by inserting a description of a number of sections of land contained in the bill as originally introduced in the legislature, but omitted from the enrolled bill. There is language contained in that decision which would indicate that this court has the right to correct the error in the case at bar. Nevertheless the court decided the case on the theory that "it is apparent from the face of the enrolled bill that lands in township four north, range nine west, are intended

to be included but were omitted in copying from the original bill." And the court made the correction by referring to the bill as originally introduced in the legislature.

In the case at bar there is nothing apparent on the face of the enrolled act which would indicate any mistake or error and the foregoing cases cited to us by counsel are therefore not in point. In the case of Athletic Mining and Smelting Company vs. Sharp, 135 Ark. 330, 205 S. W. 695, the court had under consideration an act which provided that contributory negligence should not be a matter of defense but should only diminish the damages. The bill as introduced in the legislature and passed provided "that in all actions * * * to recover damages for personal injuries (to an employee, or where such injuries) have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery" etc. The enrolled act, signed by the governor, did not contain the words in brackets as above indicated, and it was contended that the act, accordingly applied only to injuries resulting in death. The secretary of state had inserted the words in brackets, and the court held that they were properly inserted, basing its holding on the theory that "without the use of the words inclosed in brackets, the section is almost meaningless or at least quite ambiguous." In the enrolled act in question in the case at bar there is nothing that is meaningless or ambiguous, although the case last cited may be said to show that there is no definite line where the power to correct an error ceases. Nor is the error in the case at bar unimportant. On the contrary, it is vital.

The case at bar then differs materially from the cases heretofore cited. In Katerdahl vs. Daugherty, 30 Idaho 356, 164 Pac. 1017, it appears that the house and senate passed a bill which was signed by the presiding of-

ficers of each house, and was also signed and approved by the governor. But the enrolled bill failed to carry an amendment by the senate which had been agreed to by the house. The act was declared unconstitutional, the court stating in part: "No bill can become a law, unless it is presented to the governor for his approval. By the agreed statement of facts the bill as amended was never presented to the governor, and therefore cannot be a law of this state." See also 59 C. J. 588. In the case of Vaughn & Ragsdale Co. vs. State Board of Equalization, 109 Mont. 52, 96 Pac. 2nd 420, the bill as introduced did not contain the proper enacting clause, but the proper clause was inserted during its passage in the legislature. The enrolled bill failed to contain the amendment enacted by the legislature, but contained the improper enacting clause. The court, citing, among others, the foregoing Idaho case held the law unconstitutional. There was a dissenting opinion in that case by two of the justices on the theory that the invalidity of the act appeared on the face of the bill, and in view of that the journals should be consulted and the bill thus sustained. The reasoning of the foregoing cases is similar to that used by this court in State vs. Swan, and it is unnecessary to cite other cases along the same line.

Section 8 of article 4 of our constitution provides that "every bill which has passed the legislature shall, before it becomes a law, be presented to the governor. If he approve it, he shall sign it; but if not, he shall return it with his objections"etc. By the same section it is provided that when the legislature is adjourned, as it was in this case, the bill shall become a law, unless he returns it with his objections within fifteen days. If then the governor chooses to act, his action becomes a constituent part of the legislation, and it is clear that unless it can be said that he signed the identical bill, which was passed by the legislature, (immaterial and

minor errors which may be corrected according to the rules heretofore mentioned excepted) it cannot be said to be a part of the law of this state. The controlling question herein, accordingly appears to be as to whether it can be fairly said that the governor signed the bill as it was passed by the legislature. In the case of State ex rel. vs. Hall, 130 Neb. 18, 263 N. W. 400, the legislature passed an appropriation for $45,000. By an error the enrolled bill changed that sum to $10,000. The governor corrected it to $45,000 and approved the bill with this correction. The court upheld the act. If then, in the case at bar, the governor had corrected the error, it might be held, following the Nebraska court, that the legislative act as thus corrected should be sustained. And it may be that if the governor had done nothing at all, and had permitted the bill to become a law after fifteen days subsequent to adjournment of the legislature, thus eliminating the question whether the governor signed the identical bill passed by the legislature, this court might have had the power to correct the clerical error involved herein. We do not decide that point. But neither of these courses was pursued. So we come back to the question as to whether it may be fairly said that the governor signed the bill as it was passed by the legislature. And in that connection we must bear in mind that every act is presumed to be constitutional; that we resolve all reasonable doubt in its favor, and that the presumption of constitutionality not only reaches the subject matter, but applies equally to the procedural requirements in the enactment of laws. 59 C. J. 622 note 39. The letter of the governor which accompanied the bill when he filed it with the secretary of state shows that he knew of the clerical error in the enrolled act. It is clear that he wanted to approve the act insofar as it related to the revenue which should go to cities. His action as to the revenue which should go to counties is not so clear. But

he knew that the legislature by its action wanted the highway department to retain substantially 75 percent of the revenue derived from gasoline sales as theretofore, and that the legislature disposed of only 25 percent of the revenue in question. He stated in substance that if only counties were affected, he would veto the entire act. That, in view of his knowledge of the action of the legislature would seem to mean that he would not approve the act disposing of 27 percent of the revenue in question, contrary to the intention of the legislature. Still he signed the enrolled act. That would seem to give rise to the inference or presumption that he meant to approve the act insofar as 25 percent of the aforesaid revenue was concerned—in other words that he intended to and did sign the act insofar as it constitutionally could be valid. And to be valid, counties could receive only 23 percent. The result of his action then would seem to be substantially the result in State ex rel. vs. Hall, supra. In the case of Rice vs. Road Improvement District, supra, the Arkansas court stated in part:

"The chief insistence for reversal is that the bill approved by the governor was a different bill from the bill passed by the legislature. An enrolled bill, in legislative parlance, is a reproduction or copy of the identical bill passed by both houses of the General Assembly. The enrolling clerk, or committee, has no power or authority to modify a bill passed by the General Assembly in any respect. It follows that the purpose and intention of the Governor in signing an enrolled bill, or in allowing an enrolled bill to become a law without his signature, is to approve the bill passed by both branches of the legislature, or to acquiesce in such bill becoming a law. In approving an enrolled bill, therefore, it may be said that the Governor intends to, and does approve the original or identical bill passed by the General Assembly."

There may be grave doubt of the correctness of this statement in the ordinary case. In State ex rel. vs.

Swan, supra, for instance, it could hardly have been said that the governor intended to sign the act as passed by the legislature. Under the peculiar facts in this case, however, the presumption or inference of such an intendment can hardly be said to be unreasonable, particularly in view of the fact that the courts will uphold an act as constitutional if the case presented is one of reasonable doubt.

However that may be, the case of State ex rel. vs. Moore, 37 Neb. 13, 55 N. W. 299 is, in principle, identical with the case at bar. In that case it appears that the legislature passed an appropriation bill carrying $15,000 for expenses of impeachment proceedings. Through mistake the enrolling clerk entered the item as $25,000. The governor signed the bill as presented to him. Notwithstanding that fact the court upheld the appropriation to the extent of $15,000 as passed by the legislature, saying that "we think that this sum (of $25,000) being one greater than that provided by the legislature, his approval thereof included the approval of the lesser sum * * * In this case the error related to no matter of description, and could not have influenced the governor to approve the bill when a correct enrollment would lead him to veto it. By giving the law this interpretation we enforce the clearly expressed will of the people as manifested by their legislative officers. Any other conclusion would permit such clearly expressed will to be thwarted by the carelessness or dishonesty of a clerk in the enrolling rooms." The case was cited with approval in State ex rel. vs. Hall, supra (1935) and was deemed to be closely in point in that case.

The legislation in the case at bar is in the nature of an appropriation bill, in which the rule that the greater includes the less may well be applied. And it may be that the rule of State ex rel. vs. Moore cannot be ex-

tended to any other class of cases. We do not know of any sound reason why we should dissent from the Nebraska court in this case. Mistakes do occur, and it might be found unfortunate in the future in connection with appropriation and similar bills if we should now take a position contrary to State ex rel. vs. Moore. And so we approve it. Counsel for plaintiff claim that such conclusion is inconsistent with the conclusion reached in State ex rel. vs. Swan, supra. We do not think so. That case is easily distinguishable from the case at bar. In that case the governor had no knowledge of the error in the enrolled bill. He sent no communication such as he sent in this case. No rule that the greater includes the less was involved.

In follows, accordingly, that the words "twenty-five" in the first line of section 7 (1) of Chapter 72, Session Laws of 1935 as amended by Chapter 157 of the Session Laws of 1945, should be read "twenty-three", and as thus amended, the act should be upheld. The writ of mandamus asked for will be denied. No costs will be taxed in this case.

*Writ of mandamus denied.*

RINER, J., and KIMBALL, J., concur.